U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2018 JAN -5 PM 3: 58

CLERK
BY (AW)
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

W. OWEN JENKINS, )
)
    Plaintiff, )
)
    v. )    Case No. 2:17-cv-141
)
C3 RACING, INC. and )
MARC F. EVANS )
)
    Defendants. )

**OPINION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION**
(Doc. 5)

Plaintiff W. Owen Jenkins brings this action against Defendant C3 Racing, Inc., d/b/a New England Classic Car Co., and its owner, Marc F. Evans (collectively, "Defendants"), alleging six claims arising from the purchase and sale of a 1967 MGB motor vehicle ("the MGB"): (1) breach of express warranties, (2) breach of the covenant of good faith and fair dealing, (3) negligent misrepresentation, (4) fraudulent misrepresentation, (5) fraudulent concealment, and (6) unfair and deceptive business practices under Vermont's Consumer Protection Act ("CPA"), 9 V.S.A. § 2453. Plaintiff seeks compensatory damages of $22,750, punitive damages of no less than $10,000, exemplary damages of $56,655 pursuant to the CPA, attorney's fees and costs, and the payment of pre-judgment interest.

Pending before the court is Defendants' motion to dismiss for lack of subject matter jurisdiction, asserting Plaintiff's state law claims fail to exceed the $75,000 threshold for diversity of citizenship jurisdiction. (Doc. 5.) Plaintiff opposes dismissal.

Plaintiff, an attorney, is representing himself. Defendants are represented by Mary P. Kehoe, Esq.

## I. The Complaint's Allegations.

Plaintiff alleges Defendant Evans is an individual residing in Connecticut and Defendant C3 Racing, Inc., d/b/a as New England Classic Car Co., is a Connecticut Corporation. Plaintiff resides in Essex Junction, Vermont. As Defendants concede, diversity of citizenship is established.

The Complaint alleges Defendants are engaged in the business of selling classic sports cars, vintage and historic racing cars, and various other collectible vehicles. Defendants advertise their inventory on the Internet and offer delivery within the New England region.

In July 2015, Defendants bought the MGB, a 1967 motor vehicle with a removable hard top, from Daniel F. Kacher for $9,000. Before selling the MGB and in response to Defendants' inquiries, Mr. Kacher allegedly disclosed to Defendants in writing that the MGB had rust on the right door, undercarriage, and rims and verbally disclosed rust on the firewall and transmission problems.

After purchasing the MGB from Mr. Kacher, Defendants immediately offered the MGB for sale on the Internet for $17,900 without the hard top and without making any repairs or modifications. Defendants' Internet advertisement for the MGB contained the following representations: ". . . a very nice car . . . 3,000 miles on [a] rebuilt engine . . . new top, new chrome, a wonderful example of the most collectible of MGB's . . . 105 mph performance, great handling, sure braking, comfortable ride . . . ." (Doc. 1 at 3, ¶ 12) (internal quotation marks omitted).

In response to the Internet advertisement, Plaintiff contacted Defendants, asking for details about the MGB, including how Defendants had located and acquired the MGB and information regarding its overall condition because Plaintiff did not want to purchase a "project car." *Id.* at 3, ¶ 13 (internal quotation marks omitted). Defendant Evans replied that he found the MGB advertised on the Internet, had it inspected by a person acting on Defendants' behalf, and, finding the car in excellent condition, decided to buy it from Mr. Kacher. In response to Plaintiff's inquiries about specific issues with the MGB, Defendants stated that it had only 55,400 original miles, no rust, and was in "show

condition[.]" *Id.* at 4, ¶ 15 (internal quotation marks omitted). Defendants further represented in writing that:

> All of the electrics and mechanicals [were] in good working order.
>
> ... I took my little magnet, started from the front (on each side) behind the front bumper and moved the magnet along the lower edge of the body, rockers, and fenders, to the rear bumper. It stuck the entire way *making this car (one) of the best bodied early MGBs on the planet.*

*Id.* (internal quotation marks omitted).

Plaintiff discussed scheduling an appointment to view the MGB at Defendants' place of business, but Defendants "assured Plaintiff that such [a] viewing was not necessary because the condition of the [MGB] was excellent and precisely as advertised." *Id.* at 4, ¶ 17. After the parties agreed to additional minor upgrades costing $600 and a delivery cost of $385, Plaintiff bought the MGB "sight unseen" for $18,885 without an independent inspection from Defendants. (Doc. 1 at 4, ¶ 20) (internal quotation marks omitted). Defendants promised delivery of the MGB to Plaintiff in Vermont.

On October 29, 2015, Defendants' employee delivered the MGB to Plaintiff, gave Plaintiff an invoice for the car, and drove the MGB to Plaintiff's residence in South Hero, Vermont. The bill of sale contained the following warranty:

> THIS VEHICLE IS SOLD "AS IS." THIS MEANS THAT YOU WILL LOSE YOUR IMPLIED WARRANTIES. YOU WILL HAVE TO PAY FOR ANY REPAIRS NEEDED AFTER SALE. IF WE HAVE MADE ANY PROMISES TO YOU, THE LAW SAYS WE MUST KEEP THEM, EVEN IF WE SELL "AS IS." TO PROTECT YOURSELF, ASK US: 1. TO PUT ALL PROMISES INTO WRITING, AND 2. IF WE OFFER A WARRANTY ON THIS VEHICLE.

(Doc. 1-5 at 2.)

Shortly after delivery, Plaintiff notified Defendants that the MGB was not in the condition advertised by Defendants. Plaintiff advised that the MGB had:

> significant defects with respect to the windshield and transmission, had rust on the body, undercarriage, wheels, and firewall, had hood and trunk latches which would not stay latched, lacked locking mechanisms, did not have a new top (but rather an older top which had permanent red paint over-spray on it), and had excessive vibration and shaking which limited its maximum driving speed to 55 MPH.

(Doc. 1 at 5, ¶ 22.)

In response, Defendants acknowledged that they knew about the windshield defect but decided to deliver the MGB nonetheless and stated that all the other defects were unimportant "because that's what you get with a 50 year old car." *Id.* at 5, ¶ 24 (internal quotation marks omitted). In November 2015, before storing the MGB for the winter, Plaintiff installed, at his own cost, a replacement windshield provided by Defendants.

After removing the MGB from storage in May 2016, Plaintiff notified Defendants that the MGB had additional issues:

> significant defects with the engine and starter motor, including flywheel, incorrect mileage because of a broken speedometer and cable, water damage to the interior panels and carpets because the rusted-out firewall could not prevent water infiltration into the cockpit, wiring, brakes, backup fuel pump, front end bushings, and all four wheels.

*Id.* at 5-6, ¶ 27.

Upon discovering these alleged defects, Plaintiff asked Defendants to produce the MGB's full history. On June 9, 2016, Defendants produced Mr. Kacher's Internet advertisement which disclosed rust issues on the undercarriage and wheels. When questioned about the rust issues, Defendants dismissed them as "meaningless." *Id.* at 6, ¶ 30 (internal quotation marks omitted).

According to the Complaint, Mr. Kacher's advertisement and Defendants' inquiries regarding the information disclosed in that advertisement establish that Defendants had not inspected the MGB and had not determined that it was in excellent condition before purchasing it from Mr. Kacher. Instead, Plaintiff contends Defendants purchased the MGB from Mr. Kacher in "extremely poor condition" and "quickly placed [it] back on the market" for $17,900, approximately twice Defendants' $9,000 acquisition cost. (Doc. 1 at 6, ¶ 32.) In Plaintiff's estimation, the fair market value of the MGB when Plaintiff purchased it from Defendants was no more than $2,000 as a "parts car only." *Id.* at 6, ¶ 33.

On December 2, 2016, Defendants rejected Plaintiff's settlement offer. Plaintiff then inspected the MGB on a lift for the first time, discovering the following concerns:

4

the chrome bumpers were not new but rather [the] original and coated with
rust on the underside, frame damage, extensive rust to the undercarriage
and rocker panels, structural damage due to rust, and bondo applied to
cover body damage and repair to both rear fenders, and the upper and lower
rear panels.

*Id.* at 6, ¶ 34. Noticing damage to the left rear panel and rear valence, Plaintiff determined the MGB had been in at least two accidents.

To improve the MGB to its advertised condition, Plaintiff had the electrical and mechanical systems repaired or replaced and rebuilt the body and structural components of the MGB, "all at substantial costs." *Id.* at 7, ¶ 36. In making these repairs, Plaintiff "lost use of the [MGB] for the entire 2016 six month driving season and one month of the 2017 season." *Id.* at 7, ¶ 37.

## II.  Legal Analysis and Conclusions.

### A.  Standard of Review.

"[F]ederal courts are courts of limited jurisdiction and, as such, lack the power to disregard such limits as have been imposed by the Constitution or Congress." *Purdue Pharma L.P. v. Kentucky*, 704 F.3d 208, 213 (2d Cir. 2013) (internal quotation marks omitted). "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3). In his Complaint, Plaintiff invokes the court's diversity jurisdiction under 28 U.S.C. § 1332(a) which states that the federal "district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, . . . and is between[] . . . citizens of different States[.]" 28 U.S.C. § 1332(a)(1).

As the party asserting subject matter jurisdiction, Plaintiff has the burden of establishing its existence. A plaintiff invoking diversity jurisdiction "must demonstrate a 'reasonable probability' that the amount-in-controversy requirement is satisfied[.]" *Pyskaty v. Wide World of Cars, LLC*, 856 F.3d 216, 223 (2d Cir. 2017) (quoting *Tongkook Am., Inc. v. Shipton Sportswear Co.*, 14 F.3d 781, 784 (2d Cir. 1994)). "This burden is hardly onerous, however," *Scherer v. Equitable Life Assurance Soc'y of U.S.*, 347 F.3d 394, 397 (2d Cir. 2003), because the Second Circuit "recognize[s] a rebuttable

5

presumption that the face of the complaint is a good faith representation of the actual amount in controversy[.]" *Pyskaty*, 856 F.3d at 223 (citing *Colavito v. N.Y. Organ Donor Network, Inc.*, 438 F.3d 214, 221 (2d Cir. 2006)) (internal quotation marks omitted). A defendant rebuts this presumption by demonstrating "to a legal certainty that the plaintiff could not recover the amount alleged or that the damages alleged were feigned to satisfy jurisdictional minimums." *Id.* (internal quotation marks omitted); *see also St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 289 (1938) ("It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal.").

The amount in controversy requirement can be met "by a combination of economic and non-economic losses and punitive damages, so long as the punitive damages are permitted under the controlling law." *Bracken v. MH Pillars Inc.*, 2017 WL 5901015, at *2 (S.D.N.Y. Nov. 29, 2017); *see also A.F.A. Tours, Inc. v. Whitchurch*, 937 F.2d 82, 87 (2d Cir. 1991) ("[I]f punitive damages are permitted under the controlling law, the demand for such damages may be included in determining whether the jurisdictional amount is satisfied."). "[I]n computing the jurisdictional amount, a claim for punitive damages is to be given closer scrutiny[] . . . than a claim for actual damages." *Pyskaty*, 856 F.3d at 225 (citing *Zahn v. Int'l Paper Co.*, 469 F.2d 1033, 1033 n.1 (2d Cir. 1972)) (internal quotation marks and alteration omitted).

The court "may consider the facts as asserted within the four corners of the complaint together with the documents attached to the complaint as exhibits" when deciding a motion to dismiss for lack of subject matter jurisdiction. *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 64 (2d Cir. 2010) (internal quotation marks omitted). Although a court generally reads a self-represented plaintiff's submissions "liberally[,]" interpreting them "to raise the strongest arguments that they suggest[,]" *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (internal quotation marks and emphasis omitted), where the plaintiff is an attorney, the same liberality is not afforded. *See Tracy v. Freshwater*, 623 F.3d 90, 102 (2d Cir. 2010)

(stating that "a lawyer representing himself ordinarily receives" none of the "solicitude" afforded to other self-represented litigants).

Because Plaintiff alleges state statutory and common law causes of action, the substantive law of Vermont governs his claims. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *Gen. Star Nat'l Ins. Co. v. Universal Fabricators, Inc.*, 585 F.3d 662, 669 (2d Cir. 2009). "This principle . . . includes examining [Vermont's] rules regarding the applicable measure of damages and the availability of special and punitive damages, as well as a right of attorneys' fees." 14AA Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3702 (4th ed.); *see also Ocean Ships, Inc. v. Stiles*, 315 F.3d 111, 116 (2d Cir. 2002) (applying New York law in measuring the amount of damages alleged in the plaintiff's complaint to determine whether the complaint met the amount in controversy requirement).

## B. Whether Plaintiff Satisfies the Amount in Controversy Required for Diversity Jurisdiction.

Plaintiff's claim for $22,750 in compensatory damages does not, by itself, satisfy the amount in controversy requirement. Thus, whether there is diversity jurisdiction over the case turns on whether Plaintiff's Complaint sufficiently alleges statutory exemplary damages, common law punitive damages, or attorney's fees under Vermont law.

Plaintiff claims that he is entitled to statutory exemplary damages for Defendants' violation of the CPA, 9 V.S.A. § 2453.

> To prevail on a [CPA] claim, one must show that: (1) there was a representation, practice, or omission likely to mislead the consumer; (2) the consumer interpreted the message reasonably under the circumstances; and (3) the misleading effects were material, that is, likely to affect the consumer's conduct or decision with regard to a product.

*Lang McLaughry Spera Real Estate, LLC v. Hinsdale*, 2011 VT 29, ¶ 32, 190 Vt. 1, 16, 35 A.3d 100, 111 (internal quotation marks omitted). A plaintiff need not show the defendant "inten[ded] to deceive or mislead[.]" *Inkel v. Pride Chevrolet-Pontiac, Inc.*, 2008 VT 6, ¶ 10, 183 Vt. 144, 151, 945 A.2d 855, 859; *see also Winton v. Johnson & Dix Fuel Corp.*, 515 A.2d 371, 376 (Vt. 1986) ("Intentional misrepresentation or bad faith is not required for liability under the [CPA].").

7

A plaintiff alleging a violation of § 2453 of the CPA may seek exemplary damages:

> Any consumer who contracts for goods or services in reliance upon false or fraudulent representations or practices prohibited by Section 2453 . . . may sue and recover from the seller[] . . . the amount of his or her damages, . . . reasonable attorney's fees, and exemplary damages not exceeding three times the value of the consideration given by the consumer.

9 V.S.A. § 2461(b); *see also Wilder v. Aetna Life & Cas. Ins. Co.*, 433 A.2d 309, 310 (Vt. 1981) ("The [CPA] was created to protect citizens from unfair and deceptive acts in consumer transactions" and "9 V.S.A. § 2461(b), providing for treble damages, was added to the original enactment to encourage prosecution of individual consumer fraud claims.").

Pursuant to § 2461(b) of the CPA, Plaintiff alleges $55,655 in exemplary damages, or three times the sale price of the MGB, which, if combined with compensatory damages, would exceed the jurisdictional threshold of $75,000. Defendants argue that none of the allegations in the Complaint establish that Defendants acted with the requisite malice or ill will required for an award of exemplary damages under Vermont law.

To recover exemplary damages, a plaintiff must show more than a mere statutory violation of the CPA, *see Bruntaeger v. Zeller*, 515 A.2d 123, 127 (Vt. 1986) (finding exemplary damages are not "mandated merely upon a showing of a statutory violation"), as Vermont courts award exemplary damages "only where malice, ill will, or wanton conduct is demonstrated." *L'Esperance v. Benware*, 2003 VT 43, ¶ 17, 175 Vt. 292, 299, 830 A.2d 675, 682 (internal quotation marks omitted). "Malice is shown through conduct manifesting personal ill will, evidencing insult or oppression, or showing a reckless or wanton disregard of plaintiff's rights" and "may be inferred from the surrounding circumstances and the nature of the defendant's conduct." *Id.* at ¶ 18, 175 Vt. at 299-300, 830 A.2d at 682 (internal quotation marks omitted).

In this case, Plaintiff's Complaint does not allege that Defendants acted with malice, personal ill will, or a reckless or wanton disregard for Plaintiff's rights. At most,

Plaintiff alleges that Defendants' misrepresentations were, in Plaintiff's words, "knowing, wil[l]ful, and intentional[.]" (Doc. 1 at 10, ¶ 69.) Intentional misrepresentations can result in an award of exemplary damages under the CPA "only where malice, ill will, or wanton conduct is demonstrated." *L'Esperance*, 2003 VT 43, ¶ 17, 175 Vt. at 299, 830 A.2d at 682 (internal quotation marks omitted); *see also Meadowbrook Condo. Ass'n v. S. Burlington Realty Corp.*, 565 A.2d 238, 245 (Vt. 1989) (holding that the trial court erred in awarding exemplary damages in response to the defendant landlord's failure to provide promised cable television service for residents because the landlord's conduct, "however wrongful, did not evince the degree of malice required"). Because Plaintiff fails to adequately allege this element of his claim, his request for exemplary damages under the CPA cannot satisfy the amount in controversy requirement. *See, e.g., Jiminez v. Going Forward, Inc.*, 25 F. Supp. 2d 54, 55 (D. Conn. 1998) (refusing to consider the plaintiff's claim for punitive damages under Connecticut's Unfair Trade Practices Act because the court had "serious doubts" as to whether the plaintiff sufficiently alleged that the "defendant's conduct was intentional and wanton, malicious, violent or motivated by evil.").

In addition to challenging the basis for Plaintiff's claimed exemplary damages under the CPA, Defendants contend that Plaintiff has not alleged sufficient facts to support a claim for common law punitive damages under Vermont law. To establish a claim for punitive damages, a plaintiff must show (1) "wrongful conduct that is outrageously reprehensible" and (2) "malice, defined variously as bad motive, ill will, personal spite or hatred, reckless disregard, and the like." *Fly Fish Vt., Inc. v. Chapin Hill Estates, Inc.*, 2010 VT 33, ¶ 18, 187 Vt. 541, 548-49, 996 A.2d 1167, 1173. Thus, similar to a claim for exemplary damages under the CPA, a plaintiff must allege more than a knowing and intentional misrepresentation to obtain punitive damages under Vermont's common law. *See Centrella v. Ritz-Craft Corp. of Pa., Inc.*, 2017 WL 3720757, at *5 (D. Vt. June 28, 2017) (stating that both common law punitive damages and exemplary damages under the CPA require a showing that defendant acted with "malice, defined variously as bad motive, ill will, personal spite or hatred, reckless

9

disregard, and the like."). Plaintiff's claim for common law punitive damages therefore also fails to satisfy the amount in controversy requirement.

Finally, Plaintiff's Complaint seeks reasonable attorney's fees and costs. Attorney's fees "may be used to satisfy the amount in controversy threshold only if they are recoverable as a matter of right pursuant to statute or contract." *Cohen v. KIND L.L.C.*, 207 F. Supp. 3d 269, 272 (S.D.N.Y. 2016) (internal quotation marks omitted); *see also Givens v. W. T. Grant Co.*, 457 F.2d 612, 614 (2d Cir. 1972), *vacated on other grounds*, 409 U.S. 56 (1972) ("[I]t is settled that [attorney's fees] may not properly be included in determining the jurisdictional amount unless they are recoverable as a matter of right."). Section 2461(b) of the CPA "expressly provides that a consumer 'may sue and recover . . . reasonable attorney's fees[.]'" *Gramatan Home Inv'rs Corp. v. Starling*, 470 A.2d 1157, 1162 (Vt. 1983) (quoting 9 V.S.A. § 2461(b)). The United States Supreme Court and Second Circuit have held, however, that a self-represented attorney should not be awarded attorney's fees even if the statutory cause of action so provides. *See, e.g., Kay v. Ehrler*, 499 U.S. 432, 438 (1991) (denying an award of attorney's fees for a prevailing self-represented attorney seeking fees under 42 U.S.C. § 1988); *Hawkins v. 1115 Legal Serv. Care*, 163 F.3d 684, 694-95 (2d Cir. 1998) (holding that a self-represented attorney is not permitted to recover attorney's fees in a Title VII or a § 1981 action); *see also Adamson v. Dodge*, 2006 VT 89, ¶ 8, 180 Vt. 612, 615, 910 A.2d 821, 824 ("Nor can we award attorney's fees for pro se representation" (citing *Kay*, 499 U.S. at 435)). While Plaintiff represents that he "will in all probability hire counsel" at a future date (Doc. 12 at 4 n.3), at present, he proceeds as a self-represented attorney. His request for reasonable attorney's fees therefore cannot contribute to the amount in controversy requirement.

## CONCLUSION

Because Plaintiff has not met his burden of demonstrating a reasonable probability that the amount in controversy threshold is satisfied for diversity jurisdiction, 28 U.S.C. § 1332(a)(1), the court lacks subject matter jurisdiction over this action. The court

10

therefore GRANTS Defendants' motion to dismiss (Doc. 5) and DISMISSES Plaintiff's Complaint WITHOUT PREJUDICE.

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 5th day of January, 2018.

Christina Reiss, District Judge
United States District Court